UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LILLIA BURNETT, ET AL.,                    :
     Plaintiffs,                           :
                                     :
v.                                                          :          No. 3:17cv741 (DJS)
                                     :
AT&T INC., ET AL.,                            :
     Defendants.                          :

RULING ON DEFENDANT AT&T MOBILITY'S MOTION FOR SUMMARY JUDGMENT

The plaintiffs, Lillia Burnett, Paul Anderson, Brittany Anderson, and Tristin Gaddy,

allege that the defendant, AT&T Mobility II, LLC ("AT&T Mobility")[1] is liable for damages

resulting from a fire at the plaintiffs' residence on the basis of the Connecticut Product Liability

Act ("CPLA"). The plaintiffs also raise claims of breach of warranty and negligence. AT&T

Mobility has moved for summary judgment on all claims against it. For the reasons stated below,

AT&T Mobility's motion is granted.

I.       STANDARD

A motion for summary judgment shall be granted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate if, after discovery, the nonmoving

party "has failed to make a sufficient showing on an essential element of her case with respect to

---

[1] The Amended Complaint also named as defendants AT&T Inc., Pantech Wireless, Inc.,
Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc. (Doc. # 23). In a Notice
of Bankruptcy Discharge filed on December 18, 2018, the plaintiffs identify AT&T Mobility II,
LLC and Samsung Electronics America, Inc. as the "remaining defendants" in this case. (Doc. #
49, at 2). The Court previously dismissed all claims against AT&T, Inc. and Samsung
Electronics America, Inc. Pantech Wireless, Inc. was discharged by the U.S. Bankruptcy Court
from any debt arising before 2018, and the plaintiffs never properly served Samsung Electronics
Co., Ltd.

which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." *American International Group, Inc. v. London American International Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (internal quotation marks omitted). The moving party can satisfy its burden of production under Rule 56 by "demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (internal quotation marks omitted).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute concerning a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party "must present specific evidence demonstrating a genuine dispute." *Gannon v. UPS*, 529 F. App'x 102, 103 (2d Cir. 2013).

In reviewing the record, the court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enterprises, L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013). Summary judgment is improper if there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the nonmoving party. *See Security Insurance Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

II.     FACTS

Although the plaintiffs deny many of the factual statements contained in AT&T

Mobility's Local Rule 56(a)1 Statement, any number of those denials cite to evidence that either

does not address or does not refute the corresponding factual statement. For example, AT&T

Mobility asserts that "Joel Bayer assisted Mrs. Burnett in filing an insurance claim" and includes

a citation to a specific page of Bayer's deposition transcript where he describes how he assisted

her with filing her claim. (Doc. # 91, at 2, ¶ 10). The plaintiffs' response to that factual assertion

is: "Deny. Admit only that, 'Yes, I said I [am] going to be without a phone. And I have a sick kid

at home. So I really need a phone. Just in case for emergency, you know'. Burnett Depo at

82:17-19, 82:20-25, Exhibit 1." (Doc. # 103, at 4-5, ¶ 10). The evidence the plaintiffs cite in

support of their denial neither refutes nor addresses the statement that "Joel Bayer assisted Mrs.

Burnett in filing an insurance claim." In fact, Lillia Burnett specifically addressed the matter of

an insurance claim at her deposition and testified that Bayer assisted her with the claim process.

(Doc. # 96-2, at 17, p. 81:9, 17-22). To the extent AT&T Mobility's statements of fact are

supported by admissible evidence and the plaintiffs' denials are based on evidence that either

does not refute or does not address those statements, AT&T Mobility's statements of fact are

deemed admitted.

On February 11, 2017, the plaintiff Lillia Burnett ("Burnett") went to a store in Hartford,

Connecticut identified as an "AT&T Authorized Retailer" ("the Store").[2] Burnett informed the

Store manager, Joel Bayer ("Bayer"), that her cell phone had been lost or stolen. Bayer assisted

Burnett in filing an insurance claim regarding her missing phone. Burnett told Bayer she had a

---

[2] The plaintiffs contend that AT&T Mobility was the operator of the store, while AT&T Mobility
contends that the store was operated by another entity doing business as Spring Mobile.

sick child at home and needed a phone right away in case of an emergency. Bayer then retrieved a cell phone that had been in his personal possession for somewhere between one to two years and gave it to Burnett as a temporary replacement for her missing phone. Burnett's lost or stolen cell phone was a Samsung Galaxy S6 and the temporary replacement phone Bayer gave her was a Pantech Breeze III flip phone ("the Pantech phone"). Bayer advised Burnett to use the charger she had been using for her Samsung Galaxy S6 phone to charge the Pantech phone. Samsung Galaxy 6 and Pantech Breeze III phones are both AT&T-branded products. The Pantech phone loaned to Burnett by Bayer on February 11, 2014 had been distributed by AT&T Mobility to Wireless Connection II in Fort Worth, Texas in July 2011.

The use of the AT&T brand and logo, which "is owned by AT&T Intellectual Property II LP, a subsidiary of AT&T, Inc.," is "shared by multiple companies offering different products and services who are charged a licensing fee for use of the AT&T brand and logo." (Doc. # 91-4, at 2, ¶ 6). On August 22, 2014, AT&T Mobility entered into an AT&T Exclusive National Dealer Agreement with Spring Communications Holdings, Inc.[3] Pursuant to that Agreement, Spring Communications Holdings, Inc., doing business as Spring Mobile, was an AT&T authorized dealer operating at the Store where Burnett was given the Pantech phone. The Store had signage outside the building reading, "AT&T Authorized Retailer." (Doc. # 96-19, at 1-7). Bayer's employer on February 11, 2017, and the only telecommunications employer he had up to that point, was Spring Mobile. AT&T Mobility did not operate its own retail store at the location where Burnett was given the Pantech phone.

---

[3] This information is included in an affidavit which the plaintiffs have asked the Court to disregard. (Doc. # 100-1, at 1-3. The Court denies the plaintiffs' request and will discuss this matter at greater length at a later point in this Ruling.

During the time Bayer worked for Spring Mobile, the Store did not have phones in stock that were loaned to customers who were waiting for a replacement phone. AT&T Mobility prohibits loaner phones in its corporate-owned stores and in AT&T authorized retailer stores.

At approximately 1:30 a.m. on February 14, 2017, a fire occurred at Burnett's house in West Hartford, Connecticut. The plaintiffs Burnett, Brittany Anderson ("Anderson"), and Tristan Gaddy ("Gaddy") were inside the house at the time of the fire. The fire started in the second floor bedroom that was being shared by Burnett and Gaddy, her 10 year old grandson. At the time the fire occurred, the Pantech phone was next to Burnett's bed being charged on a Samsung charger. Gaddy, who had returned to his grandmother's house shortly before 1:00 a.m., was nearly asleep when he began to smell smoke. He got up and began looking around the house to find the source of the smoke smell. After he returned to the bedroom he saw the Pantech phone on the floor next to the bed with its screen shattered and a dark liquid coming out of the phone. He then "looked under the bed and . . . saw little flames." (Doc. # 96-4, at 9, p. 37:17-18). After an unsuccessful attempt to extinguish the flames, Gaddy woke up Burnett and Anderson. All three tried to put out the fire, which at that point was "eating up the whole mattress," but were unable to do so. (*Id.* at 7, p. 34:3-4). Anderson then called 911 and the three of them left the house.

Christopher Musante ("Musante"), a Senior Consultant with the Fire and Explosion Division of Envista Forensics, began an onsite investigation into the fire's origin and cause on February 17, 2017, at the request of the home's insurer. During his investigation, Musante discovered the remains of a cell phone in the bedroom where the fire started and separately located the remains of a cell phone battery in that same bedroom. Musante placed the remains of

the cell phone and the remains of the cell phone battery in two separate plastic bags and left them where he found them at the fire scene.

Musante subsequently spoke with plaintiffs' counsel and informed him that he had discovered and bagged evidence in the bedroom where the fire started. Musante advised counsel that the scene had to be preserved pending further direction from the client, i.e, the insurance company. In a follow-up email to Musante, plaintiffs' counsel expressed his understanding that "the Pantech flip mobile phone device that caused the fire is still at the property and under control of your client. Please preserve this evidence for use in the civil action . . . which I will be commencing in a few days." (Doc. # 80-6, at 3).[4] According to plaintiffs' counsel, Musante never mentioned that there was a second plastic bag containing the remains of the cell phone battery in the bedroom. At his deposition, Musante was asked whether he told plaintiffs' counsel there were two bags of material in the bedroom. Musante responded that he was "[u]nsure if I said one or two, or just identified it as, you know, there's items that had been preserved within the bedroom area." (Doc. # 80-4, at 13, p. 78:6-8).

In May 2017, plaintiffs' counsel sought and received the insurer's "permission to enter the property to take inventory of the damaged household contents." (Doc. # 80-10, at 2). Plaintiffs' counsel then informed defendants' counsel "that Plaintiffs' appraiser, Scott Terra will be arranging to enter the premises to take inventory of the damaged personal contents on the

---

[4] This citation refers to an exhibit filed in support of AT&T Mobility's Motion for Sanctions for Spoliation of Evidence.  (Doc. # 80).  AT&T Mobility expressly incorporated the "Motion for Sanctions regarding spoliation of evidence with supporting documentation" into its Motion for Summary Judgment. (Doc. # 92, at 7).

premises. Please advise of your appraiser's available dates in the next 2 weeks." [5] (Doc. # 80-12, at 2). Defendants' counsel did not respond to this request.

In connection with a site visit scheduled by the plaintiffs' appraiser, plaintiffs' counsel asked the appraiser to pick up "a bag containing a cell phone in the area of [the fire's] origin . . . . and bring it to my office." (Doc. # 80-14, at 11, p. 46:12-13). During his site visit the appraiser found a plastic bag in the area of origin, took possession of the bag, and brought it to plaintiffs' counsel's office. The plastic bag contained the remains of the Pantech phone.

In a June 5, 2017 email to defendants' counsel, plaintiff's counsel noted that there had been no response to his notice that plaintiffs' appraiser was going to inventory the personal property at the premises. He then went on state that "[p]laintiffs' appraiser went onto the premises last week to take said inventory and observed mold growth at the premises due to significant amount of water accumulation. The appraiser has retrieved the mobile device that caused the damage. Please let me know what date you want to inspect the device at counsel's office . . . ." (Doc. # 80-15, at 2).

At a joint inspection of the cell phone remains in August 2019,[6] AT&T Mobility learned that the phone did not have its battery. In October 2019, AT&T Mobility learned that Musante had found and bagged the remains of a cell phone battery. The bag containing the cell phone battery remains that Musante left at the fire site was never recovered. According to plaintiffs'

---

[5] The plaintiffs characterize this as a request to schedule a joint inspection of the property and argue that the defendants' non-response constituted a refusal to conduct a joint inspection of the fire scene. AT&T Mobility contends that counsel's request was, by its express terms, limited to an inventory of damaged personal property on the premises. The Court agrees with AT&T Mobility's assessment of counsel's notice and request.

[6] On the basis of a bankruptcy petition filed by the co-defendant Pantech Wireless, Inc., all proceedings against AT&T Mobility in this action were stayed from March 16, 2018 until January 15, 2019. (Doc. # 47 and Doc. # 56).

counsel, Burnett's house had to be demolished to avoid condemnation by the Town of West Hartford.

The plaintiffs retained Arthur Bronstein ("Bronstein") as a liability expert in this case. In his initial report dated May 21, 2019, Bronstein offered his "professional opinion that the Li-ion battery in the AT&T Pantech phone was defective, which resulted in an overheating condition and caused the fire." (Doc. # 96-8, at 17). Bronstein acknowledged at his deposition that he never had an opportunity to examine the Pantech phone's battery and had no way of knowing whether the battery in the Pantech phone on February 14, 2017 was the phone's original battery.

On December 2, 2019, after the joint inspection of the cell phone remains and his own deposition, Bronstein issued an updated report in which he stated the following: "Although both the phone and battery were located in the area of fire origin, it is the battery that has the potential energy to start a fire. Since the charger was located at the wall outlet and not within the immediate area of fire origin, this can be eliminated as a possible fire cause. To be clear, the only device that has the potential for starting this fire, was located in the immediate area of fire origin, was the subject AT&T phone, which includes the battery." (Doc. # 96-9, at 5).

### III.   DISCUSSION

#### A.   Connecticut Product Liability Act

AT&T Mobility argues that it is entitled to summary judgment as to the plaintiffs' CPLA claim because the plaintiffs cannot establish any defect in the Pantech phone at the time AT&T Mobility distributed the phone to Wireless Connection II in 2011 and cannot establish that AT&T Mobility was a "product seller" with regard to the loan of the phone to Burnett in 2017. The plaintiffs' opposition to the motion for summary judgment invokes what is known as the

"malfunction theory." "The malfunction theory of products liability permits the plaintiff to

establish a prima facie product liability case on the basis of circumstantial evidence when direct

evidence of a defect is unavailable." *Metropolitan Property and Casualty Insurance Co. v. Deere

and Co.*, 302 Conn. 123, 133 (2011).

The "two basic elements" of the malfunction theory are that "(1) the incident that caused

the plaintiff's harm was of a kind that ordinarily does not occur in the absence of a product

defect, and (2) any defect most likely existed at the time the product left the manufacturer's or

seller's control and was not the result of the reasonably possible causes not attributable to the

manufacturer or seller." *White v. Mazda Motor of America, Inc.*, 313 Conn. 610, 623 (2014)

(internal quotation marks omitted). A plaintiff relying on the malfunction theory must "establish

the existence of a defect at the time of sale or distribution through circumstantial evidence

supporting an inference that an unspecified defect most likely caused the accident by virtue of

the fact that other possible causes of the accident are absent." *Id.* AT&T Mobility argues that the

plaintiffs cannot satisfy either of the two elements of the malfunction theory.[7]

Assuming for the sake of argument that the plaintiffs satisfied the first element of the

malfunction theory, i.e., that the incident that caused the plaintiff's harm was of a kind that

ordinarily does not occur in the absence of a product defect, it is clear they failed to satisfy the

second element. "Even if a plaintiff presents sufficient evidence to establish that a product defect

most likely caused the plaintiff's harm, there remains the possibility that the defect resulted from

---

[7] AT&T Mobility also argues that the plaintiffs failed to plead the elements of the malfunction theory in their Amended Complaint and, for that reason, the Court should not consider the application of the malfunction theory in this case. For purposes of ruling on AT&T Mobility's motion for summary judgment the Court will assume, without deciding, that the Amended Complaint alleges the elements of the malfunction theory.

something not attributable to the manufacturer, such as the age of the product, abuse or improper maintenance. The plaintiff therefore must present sufficient evidence to negate a reasonable possibility that something or someone besides the manufacturer caused the defect in the product." *Metropolitan Property and Casualty Insurance Co.*, 302 Conn. at 142-43.

The CPLA defines a "product seller" as "any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption. The term 'product seller' also includes lessors or bailors of products who are engaged in the business of leasing or bailment of products." Conn. Gen. Stat. §52-572m (a). AT&T Mobility acknowledges it was a "distributor" of the Pantech phone in 2011: "[T]he defendant distributed the Pantech . . . phone . . . in July of 2011 to Wireless Connection II in Fort Worth Texas." (Doc. # 91-7, at 2, ¶ 1).  "'Evidence may permit the inference that a defect in the product at the time of the harm-causing incident caused the product to malfunction, but not the inference that the defect existed at the time of sale or distribution. Such factors as the age of the product, possible alteration by repairers or others, and misuse by the plaintiff or third parties may have introduced the defect that causes harm.'" *White*, 313 Conn. at 668-69 (Eveleigh, J., dissenting) (quoting Restatement (Third) of Torts: Products Liability §3, comment (d)). The plaintiffs have provided no evidence that would support an inference that a defect in the Pantech phone (including its battery) existed at the time AT&T distributed the phone in 2011.

Although the malfunction theory "lower[s] the [plaintiff's] burden by removing the requirement that a plaintiff present direct evidence of a defect," it also "rais[es] it by requiring that a plaintiff negate other possible causes of the accident." *Id.* at 626. In this instance, testimony from Bronstein, the plaintiffs' liability expert, demonstrates that the plaintiffs did not

satisfy their burden of negating possible causes of the fire other than a defect attributable to AT&T Mobility. Bronstein opined that the battery in the Pantech phone was defective and caused the fire. He also testified, however, that possible reasons why the battery did not operate as intended included the following: "Age of the battery. Maybe it was overcharged at some time. Maybe the battery had been previously used in a different device that it didn't belong [in]. Maybe it was charged in a cold environment. Maybe it was left in a hot car. I don't know." (Doc. # 91-12, at 11, p. 77:3-7). He also testified that he had "no way of knowing" whether the battery in the Pantech time at the time of the fire was the phone's original battery, (*Id*. at 5, p. 16:9-12).

In the absence of any evidence of a defect in the Pantech phone at the time it was distributed by AT&T Mobility in 2011, the plaintiffs contend that the Store in Hartford was "the property of AT&T Mobility" and, for that reason, AT&T Mobility was "the seller of the AT&T Pantech Breeze 3 phone at the time the AT&T Pantech Breeze 3 phone left the AT&T Store's control" on February 11, 217. (Doc. # 96, at 12, 21).  The plaintiffs base this contention on the following facts: "Mr. Bayer was the manager at [the] AT&T Store at 67 William Shorty Campbell Street, Hartford, CT"; "[the] AT&T Store had AT&T signage"; "[i]t was only AT&T Mobility that trained AT&T Store staff on products and services"; "[the] AT&T Store exclusively sold AT&T products and AT&T Mobility services"; "Mr. Bayer . . . used [an] AT&T Business Card with the address at 67 William Shorty Campbell Street, Hartford, CT"; "AT&T Mobility admitted it is the product seller"; and "counsel for AT&T Inc. . . . disclosed that the . . . 'real party of interest is AT&T Mobility II LLC.'" (*Id.* at 12-13).

The plaintiffs' contention that the Store "exclusively sold AT&T products" is based on the deposition testimony of Bayer, the Store's manager. The plaintiffs' contention in that regard is contradicted by that same testimony. Bayer testified that the Store sold Apple, HTC, Motorola,

and Samsung cell phones. He testified further that "[g]enerally, all of the phones that are sold by AT&T have an AT&T mark on them somewhere," that "Apple did not" have an AT&T mark, and that "[s]ome of" the HTC phones had an AT&T mark." (Doc. # 96-3, at 7, p. 18:23-25 and at 8, p. 19:1-4).

Bayer's business card and the Store's signage both stated "AT&T Authorized Retailer." (Doc. # 96-10, at 2 and Doc. # 96-19, at 1-7). When Burnett was asked at her deposition what the designation "AT&T Authorized Dealer" on Bayer's business card and the store's signage meant, her response was, "That you got license to get - - to do the work with AT&T." (Doc. # 96-2, at 39, p. 132:16-17). These facts provide no support for the contention that AT&T Mobility was "the seller" of the Pantech phone. Likewise the facts that AT&T Mobility provided Store employees with information about AT&T products and services and that Store employees accessed training programs required by Spring Mobile through an AT&T online system do not constitute evidence that AT&T Mobility effectively owned the Store and thereby was the seller of the Pantech phone.

The plaintiffs' assertion that AT&T Mobility admitted it is the product seller is based on AT&T Mobility's initial interrogatory response that "[t]his defendant has not seen the product as identified by the plaintiff . . . [but] believes the [Pantech] phone was shipped to Wireless Connection II in Willimantic, Connecticut by AT&T Mobility II LLC." (Doc. # 96-12, at 2, ¶ 1). AT&T Mobility later supplemented its response as follows: "As set forth in the documentation previously provided, the defendant distributed the Pantech Breeze III mobile phone . . . in July of 2011 to Wireless Connection II in Fort Worth Texas." (Doc. # 91-7, at 2, ¶ 1). AT&T Mobility's prior distribution of the Pantech phone to Wireless Connection II does not suggest that AT&T Mobility was the seller of the Pantech phone at the Store in Hartford in 2017.

The plaintiffs' reference to a disclosure by counsel that AT&T Mobility is the real party in interest is likewise unavailing to their claim. The plaintiffs' original Complaint named AT&T Inc., and not AT&T Mobility, as a defendant. On May 11, 2017, Attorney Paul Williams sent an email to plaintiffs' counsel advising him that "AT&T Inc. is a Holding Company with no operational functions and should not be a defendant.[8] The real party of interest is AT&T Mobility II LLC." (Doc. # 96-17, at 3). This clarification of the distinction between two AT&T entities, one a holding company (AT&T Inc.) and the other a subsidiary of the holding company (AT&T Mobility) does not constitute an admission that AT&T Mobility was the seller of the Pantech phone in 2017.

The evidence before the Court would not support a finding by a reasonable jury that the Store was the property of AT&T Mobility and that, for that reason, AT&T Mobility was "the seller of the AT&T Pantech Breeze 3 phone" on February 11, 217." (Doc. # 96, at 12, 21).

Apart from the question of whether AT&T Mobility effectively "owned" the Store, AT&T Mobility contends that for purposes of the CPLA, it could not be considered a "seller" of the Pantech phone. As previously noted, the CPLA defines a "product seller" as "any person or entity . . . . who is engaged in the business of selling such products . . . [including] lessors or bailors of products who are engaged in the business of leasing or bailment of products." Conn. Gen Stat. §52-572m (a). The Pantech phone was loaned to Burnett by the Store manager as a temporary replacement for her missing phone. The Pantech phone clearly was not sold to Burnett. To the extent Bayer's loan of the Pantech phone to Burnett could be considered a bailment, there is no evidence that AT&T Mobility was "engaged in the business of . . .

---

[8] The Court subsequently granted AT&T Inc.'s motion to dismiss based on a lack of personal jurisdiction. (Doc. # 47, at 2-7).

bailment" of loaner phones, much less the Pantech phone given to Burnett at the store in

Hartford. In fact, the evidence demonstrates that AT&T Mobility prohibits loaner phones in its

corporate-owned stores and in AT&T authorized retailer stores. The Court finds that AT&T

Mobility was not a "product seller" under the CPLA with respect to the loan of the Pantech

phone to Burnett.

The plaintiffs have not produced evidence that would demonstrate the basic elements of a

malfunction theory with regard to AT&T Mobility or that AT&T Mobility was a product seller

of the Pantech phone. Consequently, AT&T Mobility's motion for summary judgment is granted

as to the plaintiffs' CPLA claim.

B.  Breach of Warranty and Negligence

Count Two of the Amended Complaint raises a breach of warranty claim and Count

Three raises a negligence claim. Both of those Counts incorporate the following language

contained in Count One: "this action is brought pursuant to the Connecticut Products Liability

Act" and "at all times mentioned herein, each defendant was a product seller and or manufacturer

as defined in [the Connecticut Product Liability Act]." (Doc. # 23, at 3, ¶¶ 10, 11; at 7, ¶¶ 1-20;

and at 8, ¶¶ 1-19).

In their memorandum in opposition to AT&T Mobility's motion for summary judgment,

the plaintiffs argue that "[i]f the CPLA is inapplicable because this Court determined that AT&T

Mobility is not a product seller, then AT&T Mobility is liable [for breach of warranty and

negligence] under agency theory. AT&t Mobility's agent, AT&T Store along with its employee

and manager, Mr. Bayer, was acting on behalf of AT&T Mobility." (Doc. # 96, at 22).

 "It is fundamental in our law that the right of a plaintiff to recover is limited to the

allegations of his complaint." *Weiss v. Wiederlight*, 208 Conn. 525, 537 (1988) (internal

quotation marks omitted). Courts "cannot look beyond the complaint for facts not alleged." *Id.* Consistent with that fundamental principle, "[a] complaint cannot be amended merely by raising new facts and theories in plaintiff's opposition papers, and hence such new allegations and claims should not be considered in resolving the [summary judgment] motion." *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99 CV 10452 (GBD), 2004 U.S. Dist. LEXIS 25336, at *20 (S.D.N.Y. Dec. 15, 2004).

The plaintiffs did not raise an agency theory of liability in their Amended Complaint and did not move to further amend their complaint to raise such a theory. In their opposition memorandum the plaintiffs argue that "AT&T Mobility was aware before the filing of this motion for summary judgment that Plaintiffs raised the alternative claim of liability against AT&T Mobility under agency theory" based on information included in a document prepared for purposes of settlement discussions. (Doc. # 96, at 23). Statements made in a settlement-related document do not equate to a claim properly raised in a complaint.  Additionally, evidence of "a statement made during compromise negotiations" about a disputed claim "is not admissible . . . either to prove or disprove the validity . . . of a disputed claim . . . ." Fed. R. Evid. 408. The Court concludes that the plaintiffs' agency theory of liability, which was not raised in the Amended Complaint, "should not be considered in resolving" AT&T Mobility's summary judgment motion.  *Southwick Clothing*, 2004 U.S. Dist. LEXIS 25336, at *20. Since the plaintiffs' remaining claims against AT&T Mobility are based entirely on their agency theory of liability, and the Court has concluded that the plaintiffs' agency theory should not be considered in resolving AT&T Mobility's summary judgment motion, the plaintiffs' remaining claims against AT&T Mobility fail.

Even if the Court were to consider the plaintiffs' agency theory, their claims would not survive AT&T Mobility's summary judgment motion. "'Agency is defined as the fiduciary relationship that arises when one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" *Pelletier Mechanical Services, LLC v. G & W Management, Inc.*, 162 Conn. App. 294, 305 (2016) (quoting 1 Restatement (Third), Agency, § 1.01, p. 17 (2006)). The plaintiffs contend that the Store and its employees were agents of AT&T Mobility because: AT&T Mobility distributed its products through the Store, AT&T Mobility provided information and training regarding those products to Store employees, and because the Store was identified, through signage and Bayer's business card, as an "AT&T Authorized Retailer."

AT&T Mobility acknowledges that Spring Communications "was a limited agent of AT&T Mobility II" with regard to AT&T Mobility cellular *service*, but contends that "Spring Communications had no agency relationship with AT&T Mobility II with respect to the selling or loaning of *equipment*." (Doc. # 100, at 22, ¶ 51) (emphasis added). In support of that contention, AT&T cites to language in an Exclusive National Dealer Agreement (the "Agreement") entered into between AT&T Mobility and Spring Communications Mobility in 2014.

AT&T Mobility brought the Agreement's pertinent language to the Court's attention in its reply memorandum in support of the motion for summary judgment. (Doc. # 99, at 5-6). At the same time it filed its reply memorandum, AT&T Mobility also filed Defendant's Supplemental Rule 56(a)1 Statement, which included an affidavit from an AT&T Mobility

16

official verifying the pertinent language in the Agreement and confirming that the Agreement

was in effect on February 11, 2017. (Doc. # 100-1).

The plaintiffs have objected to AT&T Mobility's Supplemental Rule 56(a)1 Statement

and requested that the Court not consider the facts asserted in the supplemental statement. The

plaintiffs argue that the Local Rules do not provide for a supplemental statement of facts, that the

supplemental affidavit of the AT&T Mobility official should have been filed with the original

summary judgment motion, and that the supplemental statement addresses claims that have been

abandoned.

The Amended Complaint does not raise a claim that AT&T Mobility is liable for a breach

of warranty or negligence on the basis of an agency relationship between AT&T Mobility and

the operator of the Store, i.e., Spring Communications. Consequently, AT&T Mobility could not

have been expected to address such a claim in its summary judgment motion. The plaintiffs

counter with the argument that AT&T Mobility should have addressed the agency question in its

summary judgment motion because it "was aware before the filing of this motion for summary

judgment that Plaintiffs raised the alternative claim of liability against AT&T Mobility under

agency theory." (Doc. # 96, at 23).

The plaintiffs claim they made AT&T Mobility aware of their agency theory of liability

in a document they submitted in advance of settlement discussions. As previously noted, a

statement made in a settlement-related document does not constitute a claim properly raised in a

complaint. Additionally, the document the plaintiffs refer to does not indicate that the Store and

its employees were agents of AT&T Mobility. Instead, it states that "SEA[9] distributes its product

---

[9] SEA (Samsung Electronics America Inc.) was named as a co-defendant in the Amended
Complaint.

through AT&T Stores. AT&T and its authorized AT&T retailers are the agents of SEA. In the course of replacing Burnett's lost or stolen Samsung Phone Galaxy S6, SEA's agents loaned the defective AT&T Pantech 3 Phone to Burnett to use pending the delivery of another Samsung Phone Galaxy S6." (Doc. # 96-15, at 6). The Court finds no merit in the plaintiffs' argument that AT&T Mobility should have addressed an issue in its summary judgment motion that was not raised in the operative complaint, and that, by failing to do so, AT&T Mobility has abandoned its defense to that claim.

In its reply memorandum, AT&T Mobility represents that "[t]he Agreement was sent to plaintiffs' counsel on May 2, 2019." (Doc. # 99, at 5 n.2). The plaintiffs have not disputed this representation, nor have they disputed the accuracy of the language in the Agreement quoted in the reply memorandum and the affidavit. The Local Rules do not address the subject of supplemental Rule 56(a)1 Statements. In light of the circumstances under which the plaintiffs raised their agency theory of liability, i.e., raising that claim in a response to the summary judgment motion, and given the fact that AT&T has represented that the plaintiffs were provided with a copy of the Agreement long before the plaintiffs filed their response to the summary judgment motion, the Court denies the plaintiffs' request that it disregard the information concerning the Agreement contained in AT&T Mobility's Supplemental Rule 56(a)1 Statement, including the affidavit filed with the supplemental statement.

The "'existence and scope of an agency relationship can be resolved as a matter of law' where 'facts are undisputed' or 'there is but one way for a reasonable jury to interpret them.'" *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (quoting *Garanti Finansasl Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 71 (2d Cir. 2012)). The Agreement expressly addresses the nature of the relationship between AT&T Mobility (the "Company") and

Spring Communications (the "Dealer"): "The relationship created by this Agreement is that of

independent contracting parties and does not directly or indirectly give rise to any other

relationship . . . . Personnel employed by, or acting under the authority of a party to this

Agreement, are not employees or agents of the other party. . . . Dealer is not a general agent of

Company, but is only a limited agent as described in the section of this Agreement related to

CPNI." (Doc. # 100-1, at 2, ¶ 5).  The section of the Agreement related to CPNI provides in part

as follows:

> Notwithstanding any other provision of this Agreement, <u>Dealer is deemed Company's agent for</u>
> <u>the sole and limited purpose of marketing and selling Service</u> authorized under this Agreement.
> Dealer acts on Company's behalf with respect to these services, and Dealer's sales and
> marketing of these services must be conducted according to the terms, conditions, and
> requirements of this Agreement. Further, to the extent that Dealer obtains or uses CPNI in
> connection with this Agreement, Dealer is an agent of Company with respect to the receipt and
> use of this information. "CPNI" means Customer Proprietary Network Information as defined by
> the Federal Communications Act of 1934, as amended, and the Federal Communications
> Commission rules promulgated thereunder[10] . . . .

(*Id.*) (emphasis added).

The Agreement defines "Service" as "[a]ll voice and data communications, broadband,

home automation and security or video services provided by the AT&T Affiliates, whether or not

Dealer is authorized to sell those services." (*Id.* at 3 n.i). The term "Equipment" is defined in the

Agreement as "[e]lectronic devices necessary for using Service that comply with Company's

---

[10] "The term 'customer proprietary network information means . . . information that relates to the
quantity, technical configuration, type, destination, location, and amount of use of a
telecommunications service subscribed to by any customer of a telecommunications carrier, and
that is made available to the carrier by the customer solely by virtue of the carrier-customer
relationship; and . . . information contained in the bills pertaining to telephone exchange service
or telephone toll service received by a customer of a carrier; except that such term does not
include subscriber list information." 47 U.S.C. §222(h)(1).

technical standards and fraud prevention specifications and that are certified by Company for use on the appropriate Service." (*Id.* at 3 n.ii).

The terms of the Agreement clearly limit the agency relationship between AT&T Mobility and the Store (Spring Communications) to the marketing and sale of "Service," e.g., AT&T wireless communications. By the express terms of the Agreement, that agency relationship would not extend to the marketing and sale of "Equipment," e.g., cell phones. Signs or business cards indicating that the Store was an "Authorized AT&T Retailer," and information or training provided to Store employees by AT&T Mobility regarding AT&T products and services were not inconsistent with the terms of the Agreement governing the relationship between the parties.

The plaintiffs have provided no evidence that would support a finding that the Store and its employees acted as agents of AT&T Mobility in connection with the sale of cell phones, much less the loan of the Pantech phone to Burnett by Bayer in contravention of AT&T Mobility's prohibition against loaner phones in AT&T authorized retailer stores. Even if the plaintiffs' agency theory of liability had been properly raised, the plaintiffs failed to demonstrate that Bayer was acting as an agent of AT&T Mobility when he loaned the Pantech phone to Burnett. Since the breach of warranty and negligence claims are both based on the plaintiffs' agency theory of liability, those claims fail. AT&T Mobility's motion for summary judgment is granted as to the plaintiffs' breach of warranty and negligence claims.

CONCLUSION

For the reasons stated above, AT&T Mobility's motion for summary judgment (**doc. # 90**) is **GRANTED**.

On March 16, 2018, the Court dismissed all claims against the defendant AT&T, Inc. On October 9, 2018, the defendant Pantech Wireless, Inc. was discharged by the United States Bankruptcy Court from any debt arising before 2018 and the plaintiffs subsequently identified AT&T Mobility II, LLC and Samsung Electronics America, Inc. as the remaining defendants in this action. The Court granted the defendant Samsung Electronics America Inc.'s motion for summary judgment on all claims against it on July 31, 2020.

The Clerk shall enter Judgment in favor of all party defendants[11] in this action, i.e., AT&T, Inc., Pantech Wireless, Inc., Samsung Electronics America, Inc., and AT&T Mobility II, LLC and close the file.

SO ORDERED this   11th        day of August, 2020.

____/s/  DJS_____
DOMINIC J. SQUATRITO
UNITED STATES DISTRICT JUDGE

---

[11] Although Samsung Electronics Co., Ltd. ("SEC") was named as a defendant in the Amended Complaint, it was never properly served. Consequently, SEC is not considered a "party" for purposes of entering a final judgment. *See Leonhard v. United States*, 633 F.2d 599, 608-09 (2d Cir. 1980).